### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **KAITLIN LEARY** | : | **CIVIL A. NO. _____** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **JURY TRIAL DEMANDED** |
| | : | |
| **NBC UNIVERSAL MEDIA, LLC** | : | |
| **Defendant.** | : | **AUGUST 28, 2020** |

## COMPLAINT

## I.   INTRODUCTION

1.      Through this action, plaintiff Kaitlin Leary challenges the unlawful and retaliatory conduct of defendant, NBC Universal Media, LLC, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* and the Connecticut Fair Employment Practices Act, Conn. Gen. Stat. § 46a-60 *et seq.*

## II.   PARTIES

2.      Plaintiff, Kaitlin Leary (hereinafter "Leary"), is an individual residing in West Hartford, Connecticut. At all times relevant to this complaint, plaintiff was publicly known as Kate Rayner.

3.      Defendant NBC Universal Media, LLC ("NBCUniversal") is a media and entertainment company that owns and operates television networks. NBCUniversal does business in Connecticut as NBC CT and has a principal place of business in this state at 1422 New Britain Avenue in West Hartford, Connecticut (the "Company").

4.      The Company employs more than 50 people and is an employer subject to the requirements of Title VII of the Civil Rights Act of 1964, as amended, as well as the Connecticut Fair Employment Practices Act.

1

### III.   JURISDICTION

5.     This Court has subject matter jurisdiction over this matter because it presents federal questions under 28 U.S.C. § 1331, and Leary's state law claims are properly before this Court under 28 U.S.C. § 1367.

6.     Leary dual-filed a timely complaint against the Company with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and U.S. Equal Employment Opportunity Commission ("EEOC") and thereafter received a release of jurisdiction letter from the CHRO and right to sue letter from the EEOC. This action is brought within 90 days of receipt of those letters, copies of which are attached at Exhibit A. Leary has therefore exhausted her administrative remedies relating to the claims asserted herein and this action is timely.

### IV.   BACKGROUND

7.     Leary began working for the Company in September 2014 as an on-air news reporter.

8.     She remained employed with the Company in the same capacity until she resigned in January 2020.

9.     At all times relevant to this Complaint, Leary was a general assignment reporter, meaning that she was responsible for gathering and reporting on news stories. She was often out in the field, across the state of Connecticut, doing interviews for those stories and sometimes doing live shots in connection with those stories.

10.     At various times during Leary's work for the Company, she also worked the "live desk," covered for news anchors, and otherwise did much of her job based from the station. During those times, her job title and description remained the same although her daily job duties were modified.

11.     While Leary was out in the field, she typically traveled and worked in a vehicle with a photographer. When Leary was scheduled for a live shot, meaning she would be fronting the story on location, Leary and the photographer would work in the Company vehicle to put together the story package before air time.

12.     At times, the photographer would conduct interviews and Leary would put story packages together based on those interviews and front them in studio or with a "look live" shot, meaning she would not be on location when delivering the news story.

13.     During her time with the Company, Leary never had a negative performance review. She was regularly selected to fill in for news anchors in their absence, and was considered for a news anchor position. In 2019, when she went out on maternity leave following the birth of her second child, she was one of the Company's most experienced reporters.

14.     Leary reported to various supervisors throughout her employment. Beginning in or around August 2018, Leary's supervisor was Janet Hundley, who was the Company's vice president of news, also referred to as the news director.

15.     At the time Hundley joined the Company, Leary was pregnant with her second child, due in March 2019.

16.     During Leary's pregnancy, she made several requests for reasonable accommodations related to her pregnancy, including being assigned stories that would allow her access to restrooms so she could use them more frequently and, in the last few weeks of her pregnancy, requesting that she work exclusively at the station due to increased risks associated with late pregnancy.

17.     Hundley and Mary Anderson, the Company's human resources manager, demanded that Leary get doctor's notes showing her medical need for each request. When Leary

secured those notes, they demanded that she return to get more expansive doctor's notes, specifying exactly why her pregnancy required the requested accommodations.

18.     They also repeatedly demanded that Leary sign releases authorizing the Company to access *all* of her medical records before they would even consider the accommodation requests.

19.     Leary had made similar requests of the Company in connection with her first pregnancy, and was accommodated without such push back.

20.     After putting Leary through that stressful and unnecessary process and forcing her to continue working in the field for several weeks in February 2019 while she secured more detailed doctor's notes, the Company eventually permitted Leary to work from the station for her last weeks before her scheduled maternity leave.

21.     Leary's second child was born in March 2019. She was scheduled to return from maternity leave on August 1, 2019.

22.     Several weeks before Leary's scheduled return, she visited the office and spoke to Hundley about her return to work. During that conversation, Leary informed Hundley that she was exclusively breastfeeding her baby and requested accommodations to permit her to pump to express breast milk during the work day.

23.     Leary specifically requested that she be permitted to pump once in the morning at the station in its lactation room, and then to return to the station each afternoon around 3 p.m. to pump again in the lactation room.

24.     Leary had received such accommodations in scheduling her story assignments and workload when she returned following the birth of her first child.

4

25.     During that time, the Company accommodated Leary by adjusted her workload so that she was assigned to stories that permitted her to work from the station and/or did not require her to travel as far away so that she had time to return to the station to pump in its then newly built and very well-supplied private lactation room. Leary was also assigned fewer "live shots" that required her to stay on site away from the station for hours at a time. Those accommodations permitted Leary to pump at least two times at the station on most work days.

26.     Despite that history, Hundley told Leary that her request would be too difficult to manage, and suggested that Leary instead to contact La Leche, which had compiled a list of public pumping facilities across the state. Hundley told Leary that she must do that legwork so she could be prepared to pump in the field every day.

27.     Leary attempted to follow up with Hundley on her request for accommodations after doing unsuccessful research to find the list of public pumping facilities that Hundley had insisted existed. Hundley did not respond to Leary, so Leary returned to work without having any plans in place with respect to her need to pump.

28.     Hundley and Anderson did not meet with Leary on her first or second day back at work, despite promising they would. On Leary's second day back at work, she went out on assignment in the field, expecting to return to the station in the afternoon to pump. Instead, Hundley emailed Leary, telling her to pump at a nearby Target store or a hospital rather than returning to the station, and to plan on doing the same every day.

29.     Over the next several weeks, Hundley and Anderson continued to deny Leary's request for accommodations. They insisted, in meetings, emails and telephone calls, that the Company had no obligation to accommodate Leary and that Leary was responsible for finding places to pump every day while out on assignment.

5

30.     Hundley and Anderson also refused to engage in any discussions with Leary about alternative accommodations or to explain why the Company was suddenly unable to make an accommodation it had made over a period of several months less than two years earlier.

31.     During those weeks after Leary returned to work, Hundley told Leary that "breastfeeding doesn't count" as a disability that must be accommodated and that lactation was not entitled to protection.

32.     Hundley also repeatedly told Leary that her requests were an inconvenience and that she "has a business to run." Hundley faulted Leary for not putting her accommodations request in some sort "official" writing. Hundley accused Leary of saying that she was unable to do her job by asking for the accommodation.

33.     Hundley also claimed that Leary's job had somehow changed since her last pregnancy and return to work in a way that made Leary's requested accommodation impossible.

34.     Leary's job title and duties had not changed; she was a general assignment on-air reporter, just as she had been for the nearly six months she breastfed her first child while working.

35.     Leary's job performance did not suffer during that period of accommodation. In fact, during that time, the Company negotiated a new three-year contract with her in March 2018.

36.     After weeks of having her accommodation requests ignored, legal counsel became involved. The parties reached an agreement that included a commitment by the Company to bring Leary back to the station to pump wherever possible, to assign her to stories closest to the station, to equip a Company vehicle with window shades, a cooler and ice packs, and to provide Leary with 30 to 45 minutes time to pump twice each day, whether in the field or in the lactation room. Leary agreed to pump in the field when truly necessary, either in the car or in an appropriate facility if one was available.

37.     That agreement was illusory, as the Company failed to satisfy its commitments almost immediately.

38.     Leary was not given priority in assignments close to the station or priority on stories that did not require live shots. Nor was her workload adjusted to account for the extra time required by pumping.

39.     Leary was regularly the only reporter assigned to do two stories in two different towns, as well as a live shot. To get that workload done, she was again and again forced to skip pumping or to cut her pump time short.

40.     It took several weeks for the Company vehicle to be equipped as agreed, and during that time, Leary was regularly forced to skip pumping or to pump in locations that were unsuitable due to issues such as lack of running water or lack of locks on doors.

41.     The Company regularly denied Leary "permission" to return to the station to pump in the lactation room even where there was no reason to do so. For example, on one occasion when Leary asked to come back to the station to pump, she was told she could not do so simply because she had been able to return to the station during each of the previous two afternoons. Those afternoons had followed a week in which Leary was pumping only on location at Bradley Airport following a plane crash, and often skipped pumping due to the demands of that story.

42.     On one day, Hundley ordered Leary to go home after she returned to the station to pump in the lactation room while traveling between two story locations when she did not have express "permission" to do so.

43.     During subsequent meetings, the Company denied having made any commitments to adjust Leary's assignments or workload as an accommodation. Hundley told Leary that "we

never talked about lessening your workload or making it a priority to get back to the station," that the only commitment Hundley had ever made was to give Leary time to pump. Hundley claimed that it would be "impossible" to assign Leary to stories close to the station and because Leary was a reporter, it was her job to do what she was told without question.

44.   When Leary continued to pursue her rights to accommodation, the Company responded by subjecting her to a campaign of forced communication with Hundley and the assistant news director, Akemi Harrison, about the minute details of Leary's pumping needs and schedule, down to the minute, that amounted to harassment and required an inordinate amount of Leary's time each day.

45.   Regularly, at times when Harrison knew Leary was pumping, Harrison would send Leary additional assignments or add elements to stories that had previously been approved, thereby increasing Leary's workload and stress level and often forcing Leary to cut her pumping sessions short so she could do the added work.

46.   Repeatedly, Leary's requests to return to the station to pump were met with not only opposition but also adding road blocks to make it harder for Leary to pump, such as additional story elements or story assignments that required her to skip pumping to complete.

47.   The same happened on days that included meetings between Leary and Hundley, Anderson and/or Harrison. Those meetings were often followed by Leary being sent out to stories farther from the station, making it impossible for her return to the station to pump.

48.   Leary was also subjected to criticism about her job performance that had never occurred before she requested accommodations for breastfeeding. She was chastised for being one or three minutes late to the 9:30 a.m. assignment meeting following her morning pumping session, while other reporters walked in 15 minutes late without comment. She was told on

several occasions after her stories went on air that they lacked "color" or certain elements that Hundley or Harrison wanted included, when those completed stories had scripts *approved by Harrison* that resulted from Leary's constant communications with her throughout the day.

49.     In late October 2019, Hundley expressly told Leary that her need to pump was negatively impacting her job performance and resulted in Leary telling "incomplete" stories on air. That accusation was untrue, and in fact, one of the examples Hundley pointed to was put on the air on a day in which Leary was forced to skip pumping because at 2 p.m., she was assigned a story to be aired at 6 p.m. despite already having a story due at 4 p.m.

50.     During that meeting, Hundley told Leary that the Company would not make any effort to bring her back to the station in the afternoon to pump, and stated that "the workload is the workload" and it would never change to accommodate Leary.

51.     Hundley told Leary that she would need be "shadowed" by a manager for several days so that manager could observe Leary's work and pumping in the field. Upon information and belief, that has never happened to any other reporter.

52.     At that same meeting, Hundley issued a mandate that Leary pump only between the hours of 10 and 10:30 a.m. at the station and from 2 to 2:30 p.m. in the field on location. When Leary objected to the mandate based on her belief that the lack of flexibility would interfere with her ability to do her job as well as her ability to pump effectively, and did not provide a long enough period of time for the field pumping session, Hundley refused to listen to her.

53.     That same week, on several different occasions, both Hundley and Harrison assigned Leary to attend training sessions, conduct interviews in the field and do other work at times that directly conflicted with the pumping time mandate issues by Hundley – meaning that

Leary was left with the choice of pumping at times other than those mandated by Hundley, violating her new rule, or skipping pumping yet again.

54.     In early November 2019, Harrison called Leary into a meeting with her union representative. During the meeting, which Leary had no advance notice of, Harrison attacked Leary's performance on one particular story that she claimed had lacked certain elements. Once again, that attack was baseless, as Harrison herself had approved the script for that story before it aired and was in communication with Leary throughout that entire day about the various story elements.

55.     Leary's performance on particular stories was never questioned before she requested breastfeeding accommodations. The criticisms were designed by the Company to intimidate Leary, to try to make her look like a poor performer, and to make her working environment so difficult and unpleasant that Leary would be compelled to resign.

56.     Upon information and belief, no other Company employee, pregnant or not pregnant, with or without a disability, was ever subjected to that kind of scrutiny, performance evaluation or required level of communication.

57.     All of these actions contributed to a work environment that was so stressful and hostile that Leary suffered mental and emotional distress so severe that she began seeing a therapist in November 2019, who recommended Leary take a leave of absence and diagnosed her with post-traumatic stress disorder.

58.     Leary began a disability leave in late November 2019. She was cleared by her therapist to return to work part-time three days a week in mid-December, working up to a full-time schedule by the end of the month, conditioned on Leary being permitted to pump in the lactation room twice each work day.

59.     Rather than return Leary to work under those restrictions, the Company demanded that Leary authorize her therapist to speak with its medical professionals about her diagnosis and restrictions. When Leary did so, the Company's medical professionals delivered a multi-page missive to Leary's therapist, attacking her therapy notes and conclusions.

60.     As weeks passed and the Company continued to keep her in limbo with respect to her return to work and its ability to accommodate her restrictions – which likely would only have needed to be in place for perhaps another two months given her child's age – Leary tendered her resignation.

61.     All of the Company's actions – the demand for constant contact amounting to harassment, the after-the-fact criticisms of stories that had been approved by Leary's supervisors, sending Leary home when she returned to the station to pump, blaming failed story ideas on Leary's need to pump, and demanding that a manager-level employee "shadow" Leary during her work day – were done in retaliation for Leary's efforts to pursue her rights under the law to express breastmilk while at work.

62.     Leary has suffered severe emotional distress, including post-traumatic stress disorder and anxiety, that manifested itself in panic attacks, difficulty sleeping, nightmares, ruminating thoughts, decreased concentration and focus, and decreased confidence, which necessitated treatment by a therapist and prescription medication. She has also suffered damage to her reputation as a result of the Company's accusations about her job performance.

## COUNT ONE:
### Sex and Pregnancy Discrimination in Violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended by the Pregnancy Discrimination Act of 1978 ("PDA")

1.-62.   Paragraphs 1 through 62 are hereby incorporated as if set forth fully herein.

63.   At all times relevant to the complaint, Leary was either a pregnant or breastfeeding woman, and therefore a member of protected classes. The Company was aware of her protected class status.

64.   As set forth above, the Company discriminated against and harassed Leary on the basis of her sex and pregnancy, in violation of Title VII. This pattern of discrimination was severe and pervasive, damaging to Leary's reputation and mental and emotional health, and created a hostile work environment.

65.   Based on the foregoing, the Company discriminated against Leary because of her sex and pregnancy, in violation of Title VII and the PDA, in one or more of the following ways:

a.   It failed or refused to make a reasonable accommodation for Leary's pregnancy-related medical condition, despite the same not imposing upon the Company any undue hardship and despite the Company accommodating other similarly situated employees;

b.   It limited, segregated, or classified Leary in a way that deprived her of employment opportunities due to her pregnancy;

c.   It denied Leary employment opportunities due to her having requested reasonable accommodations due to her pregnancy;

d.   It subjected Leary to such intense scrutiny that she suffered emotional distress and was forced to take a leave of absence from work; and

e.     It subjected Leary to intolerable work conditions so intolerable that she was compelled to resign her position and leave the industry in which she had built a successful career.

66.     As a result of the Company's unlawful conduct, Leary has suffered a loss of income and other employment benefits, as well as damage to her reputation.

67.     As a further result of the Company's unlawful conduct, Leary has suffered, and will continue to suffer, severe emotional distress, including but not limited to, intimidation, embarrassment, stress anxiety, frustration, and humiliation, which has limited her ability to enjoy life's pleasures and has served to damage her reputation.

68.     As a further result of the Company's unlawful conduct, Leary has also incurred and will incur attorney's fees and costs in pursuing this action.

### COUNT TWO:
### Sex and Pregnancy Discrimination in Violation of the Connecticut
### Fair Employment Practices Act, Conn. Gen. Stat. §§ 46a-60(a)(1) and (a)(7)

1.-62.  Paragraphs 1 through 62 are hereby incorporated as if set forth fully herein.

63.     Based on the foregoing, the Company discriminated against Leary because of her sex and her pregnancy, in violation of CFEPA, in one or more of the following ways:

a.     It failed or refused to make a reasonable accommodation for Leary's pregnancy-related medical condition, despite the same not imposing upon the Company any undue hardship;

b.     It limited, segregated, or classified Leary in a way that deprived her of employment opportunities due to her pregnancy;

c.     It denied Leary employment opportunities due to her having requested reasonable accommodations due to her pregnancy;

d.      It subjected Leary to such intense scrutiny that she suffered emotional distress and was forced to take a leave of absence from work; and

e.      It subjected Leary to intolerable work conditions so intolerable that she was compelled to resign her position and leave the industry in which she had built a successful career.

64.      As a result of the Company's unlawful conduct, Leary has suffered a loss of income and other employment benefits, as well as damage to her reputation.

65.      As a further result of the Company's unlawful conduct, Leary has suffered, and will continue to suffer, severe emotional distress, including but not limited to, intimidation, embarrassment, stress anxiety, frustration, and humiliation, which has limited her ability to enjoy life's pleasures and has served to damage her reputation.

66.      As a further result of the Company's unlawful conduct, Leary has also incurred and will incur attorney's fees and costs in pursuing this action.

### COUNT THREE:
### Retaliation in Violation of Title VII, as amended by the PDA

1.-62.      Paragraphs 1 through 62 are hereby incorporated as if set forth fully herein.

63.      Based on the foregoing, the Company retaliated against Leary because she engaged in protected activity in violation of Title VII, namely, requesting a pregnancy-related accommodation and continuing to pursue her rights to the same.

64.      Leary engaged in activity protected under Title VII, and the Company had knowledge of that protected activity.

65.      As described above, the Company and/or its agents engaged in acts of retaliation against Leary shortly after learning of Leary's protected activity, including:

    a.      Micromanaging her communications and daily movements and work to such an extent that it amounted to harassment;

    b.      Negatively evaluating her job performance;

    c.      Requiring a manager to "shadow" her;

    d.      Sending her home when she pumped at the station without "permission"; and

    e.      Refusing to return her to work following her disability leave.

66.     Had Leary not pursued her legal rights by requesting and pursuing accommodations related to her pregnancy, the Company would not have taken the above actions.

67.     As a result of the Company's unlawful conduct, Leary has suffered a loss of income and other employment benefits, as well as damage to her reputation.

68.     As a further result of the Company's unlawful conduct, Leary has suffered, and will continue to suffer, severe emotional distress, including but not limited to, intimidation, embarrassment, stress anxiety, frustration, and humiliation, which has limited her ability to enjoy life's pleasures and has served to damage her reputation.

69.     As a further result of the Company's unlawful conduct, Leary has also incurred and will incur attorney's fees and costs in pursuing this action.

## COUNT FOUR:
## Retaliation in Violation of the CFEPA, Conn. Gen. Stat. §§ 46a-60(a)(4) and (a)(7)

1.-62.    Paragraphs 1 through 62 are hereby incorporated as if set forth fully herein.

63.     Based on the foregoing, the Company retaliated against Leary because she engaged in protected activity in violation of the CFEPA, namely, requesting a pregnancy-related accommodation and continuing to pursue her rights to the same.

64.     Leary engaged in protected activity under CFEPA, and the Company had knowledge of that protected activity.

65.     As described above, the Company and/or its agents engaged in acts of retaliation against Leary shortly after learning of Leary's protected activity, including:

      a.    Micromanaging her communications and daily movements and work to such an extent that it amounted to harassment;

      b.    Negatively evaluating her job performance;

      c.    Requiring a manager to "shadow" her;

      d.    Sending her home when she pumped at the station without "permission"; and

      e.    Refusing to return her to work following her disability leave.

66.     Had Leary not pursued her legal rights by requesting and pursuing accommodations related to her pregnancy, the Company would not have taken the above actions.

67.     As a result of the Company's unlawful conduct, Leary has suffered a loss of income and other employment benefits, as well as damage to her reputation.

68.     As a further result of the Company's unlawful conduct, Leary has suffered, and will continue to suffer, severe emotional distress, including but not limited to, intimidation, embarrassment, stress anxiety, frustration, and humiliation, which has limited her ability to enjoy life's pleasures and has served to damage her reputation.

69.     As a further result of the Company's unlawful conduct, Leary has also incurred and will incur attorney's fees and costs in pursuing this action.

### COUNT FIVE:
### Constructive Discharge

1.-62.   Paragraphs 1 through 62 are hereby incorporated as if set forth fully herein.

63.     The Company's unlawful actions, as set forth above, made Leary's work environment so intolerable that her resignation qualified as a fitting response.

64.     The Company intentionally created the intolerable work conditions, making those conditions so difficult and unpleasant that Leary, as a reasonable person under the circumstances she faced, was forced to resign.

65.     The Company constructively discharged Leary, causing her past and future economic loss, as well as loss of opportunity in pursuing her chosen career in the broadcast news business.

66.     The Company's actions have also caused Leary severe emotional distress, including but not limited to, intimidation, embarrassment, stress anxiety, frustration, and humiliation, which has limited her ability to enjoy life's pleasures and has served to damage her reputation.

## DEMAND FOR RELIEF

Leary hereby demands judgment in her favor, and other relief, including, but not limited to the following:

1.    Compensatory and economic damages, including, but not limited to, lost wages and benefits, emotional distress, and loss of enjoyment;

2.    Attorney's fees and costs;

3.    Interest; and

4.    Such other relief as this Court deems appropriate.

## JURY DEMAND

Leary hereby demands a trial by jury.

**PLAINTIFF,**
**KAITLIN LEARY**

By: /s/ Emily A. Gianquinto
       Emily A. Gianquinto (ct27846)
       EAG Law LLC
       21 Oak Street, Suite 601
       Hartford, CT 06106
       Tel: (860) 785-0545
       Fax: (860) 838-9027
       emily@eaglawllc.com